UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FRED RICK ATHERTON,

    Petitioner,

  v.

A. P. KANE, warden,

    Respondent.

No. C 06-6849 MHP (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Fred Rick Atherton, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Atherton was convicted in Orange County Superior Court of second degree murder with an enhancement for use of a firearm, assault with a deadly weapon, and possession of dangerous drugs. On March 18, 1988, he was sentenced to 17 years to life in prison. His habeas petition does not challenge his conviction but instead challenges an August 30, 2005 decision of the Board of Parole Hearings ("BPH"), that found him not suitable for parole. This parole hearing was conducted at a time when he was 18 years into his 17-to-life sentence.

The BPH identified the circumstances of the commitment offense, Atherton's drug and criminal activity leading up to the murder, and Atherton's failure to follow the recommendation of the previous panel to participate in self-help programs until four months before the current hearing. The BPH also noted that the district attorney and the City of Anaheim opposed parole.

Atherton sought relief in the California courts. The Orange County Superior Court denied his petition for writ of habeas corpus in a reasoned decision. The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review.

Atherton then filed his federal petition for a writ of habeas corpus. The court found cognizable a claim that his right to due process was violated because the evidence was insufficient to support the BPH's decision that he was unsuitable for parole. Respondent filed an answer and Atherton filed a traverse.

The court earlier indicated that it intended to wait for guidance from the anticipated en banc decision in Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008). Although much time has passed, Hayward remains pending in the appellate court and it is unknown to this court when the decision will be released. The court will proceed to decide the merits of the petition without the benefit of the Hayward decision. Atherton moved to lift the stay of this action but that was unnecessary because the proceedings in this action were never stayed.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at a prison in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state

2

judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.   Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the

entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129. As a matter of state law, the parole authority's decision must also satisfy the "some evidence" standard of review. See In re Lawrence, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review properly is characterized as whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous").

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to answer the question, "'some evidence' of what?"

B.  State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190. The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the

4

1  Judicial Council may issue and any sentencing information relevant to the setting of parole
2  release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the
3  panel "shall set a release date unless it determines that the gravity of the current convicted
4  offense or offenses, or the timing and gravity of current or past convicted offense or offenses,
5  is such that consideration of the public safety requires a more lengthy period of incarceration
6  for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal.
7  Penal Code § 3041(b).

8  One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole
9  date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A
10 parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A
11 parole date set under this article shall be set in a manner that provides uniform terms for
12 offenses of similar gravity and magnitude with respect to the threat to the public."[1] The
13 regulation also provides that "[t]he panel shall first determine whether the life prisoner is
14 suitable for release on parole. Regardless of the length of time served, a life prisoner shall be
15 found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose
16 an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §
17 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal.
18 Code Regs. § 2402(b).

19 The regulations contain a matrix of suggested base terms for several categories of
20 crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix
21 of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,
22 depending on some of the facts of the crime. The statutory scheme places individual
23 suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to
24 ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is
25 not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal.
26 Code Regs. § 2403(a).

27 The "Penal Code and corresponding regulations establish that the fundamental
28 consideration in parole decisions is public safety . . . [T]he core determination of 'public

5

safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[2]

A critical issue in parole denial cases concerns the parole authority's use of evidence about the murder that led to the conviction. Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 505 F.3d 846 (9th Cir. 2007).[3] Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole. Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in

1  which the court had "held that a parole board's decision to deem a prisoner unsuitable for
2  parole solely on the basis of his commitment offense comports with due process, the decision
3  was made before the inmate had served the minimum number of years required by his
4  sentence." Irons, 505 F.3d at 853.  Interpreting this statement from Irons to suggest that the
5  offense can only be relied on until the minimum number of years has been reached would
6  suffer the same problem that Sass identified in Biggs: it is not the holding of the case.  The
7  dicta in Biggs and Irons are speculative and do not determine when a denial of parole based
8  solely upon the commitment offense or pre-offense behavior violates due process.  Neither
9  logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the
10 minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

    The upshot of these three cases is that the BPH can look at immutable events, such as
12 the nature of the conviction offense and pre-conviction criminality, to predict that the
13 prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight
14 to be attributed to those immutable events should decrease over time as a predictor of future
15 dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and
16 Irons). Sass did not dispute the principle that, other things being equal, a murder committed
17 50 years ago is less probative of a prisoner's current dangerousness than one committed 10
18 years ago.  Not only does the passage of time in prison count for something, exemplary
19 behavior and rehabilitation in prison count for something according to Biggs and Irons.
20 Superintendent v. Hill's standard might be quite low, but it does require that the decision not
21 be arbitrary, and reliance on only the facts of the crime might eventually make for an
22 arbitrary decision.[4]

23 C.    Some Evidence Supports The BPH's Decision In Atherton's Case
24     1.    BPH Decision
25     The BPH identified the circumstances of the commitment offense, Atherton's drug
26 and criminal activity leading up to the murder, and Atherton's tardy return to the
27 recommended self-help programming.  The BPH also noted that the district attorney and the
28 City of Anaheim opposed parole.  In its decision, the BPH observed that Atherton had

7

1  several positive attributes. He had no CDC-115 rule violation reports during his entire stay
2  in prison. He had only one CDC-128 counseling memorandum and that was a decade earlier
3  for smoking. He also had a recent favorable psychological evaluation, had marketable skills
4  in printing and graphics. He also had completed two vocations (i.e., printing and textiles),
5  and had favorable work reports while in prison. Nonetheless, the positive aspects of his
6  behavior did not outweigh the factors of unsuitability, in the BPH's view.

        a.      Commitment Offense

In finding Atherton unsuitable, the BPH relied primarily on the murder and the circumstances leading up to it. The BPH noted that the incident showed a total disregard for the safety of others, involved Atherton terrorizing the first man he encountered and culminated with him shooting the victim in the head in a killing that was "especially cruel or callous, certain[ly] dispassionate." August 30, 2005 BPH hearing reporter's transcript ("RT"), p. 61. The BPH's decision indicates that its concern was not just the killing but the killing as the culmination of Atherton's criminal lifestyle.

Atherton killed his partner in his meth lab business by shooting him in the head. The circumstances surrounding the murder were described in the probation officer's report which was available to the BPH.

> [O]n June 22, 1987, the defendant went to the Polynesian Motel, in Anaheim, in an effort to locate the victim, John Beday. The purported reason for his trying to find the victim was that the defendant wanted to discuss with Mr. Beday the latter's having removed a number of pieces of musical equipment from the defendant's apartment. Some of the pieces belonged to Mrs. Atherton and some belonged to Mr. Beday, but had been in the possession of the defendant and his wife as collateral for loans advanced by the defendant's wife to Mr. Beday.
>
> At the Polynesian Motel, the defendant entered the open door to room number four. He was followed inside by Raymond Barthlett who was staying in that room. While standing near the threshold of the door, Mr. Barthlett saw the defendant swing what appeared to be a .357 caliber, long-barreled revolver and strike a [ceramic] pipe, smashing it. The defendant turned and said to Mr. Barthlett, "Don't even try it." He then asked Mr. Barthlett, "Where's John?", and when he did not get a satisfactory answer, he further inquired, "Where's Jerry?" After some additional conversation, the defendant ordered Mr. Barthlett to, "Get down on the floor and shut your mouth." He then placed his gun approximately one inch from Mr. Barthlett's nose with the barrel pointed directly at him and said, "Tell him I'm not fucking around anymore." The defendant immediately fired on round into an air conditioner in the room, causing Mr. Barthlett's ears to ring. He then left, driving away in a brown 1979 Subaru station wagon.

8

> A few minutes later, the defendant found Mr. Beday at a residential location in Anaheim. While the defendant was still seated in the passenger side of the above-described vehicle, and Mr. Beday was squatted down by the passenger door, the two engaged in a conversation. During a conversation, but while both were out of the car, the defendant fired one round into Mr. Beday's head, causing massive destruction of his brain.

Resp. Exh. 2, probation officer's report, pp. 4-5. Subsequent investigation by police found chemicals used to manufacture methamphetamine in the murder victim's vehicle, as well as "narcotics paraphernalia, scales, and other items used in drug trafficking" in Atherton's residence and vehicle. Id. at 5. When Atherton was arrested, he had 13.8 grams of methamphetamine in his possession. Id

### b. Atherton's Criminal Lifestyle

It is clear from the record available to the BPH that the murder was not an isolated incident but instead was the worst episode in the criminality of a drug manufacturer. Atherton was 30 years old when he committed the murder in June 1987, by which time he had a growing criminal record. See Resp. Exh. 2 at 7-8. Although the record was not full of violence, it does show that he was not just a user of drugs but also was very much in the drug business. Atherton was convicted in May 1979 for being under the influence of drugs. He was convicted for petty theft in February 1986. He was arrested for possession of a controlled substance (i.e., about a quarter ounce of methamphetamine) on February 10, 1987; that charge was still pending when he was arrested for the murder four months later. Two days after that arrest, he was arrested on February 12, 1987 for possession of a controlled substance (i.e., about 10.5 ounces of methamphetamine); he reported that he had been cited and released, and that the charges later were dropped. Two months later he was arrested on April 30, 1987 for manufacturing a controlled substance and possession of a dangerous weapon. He explained that, in this arrest, he was found with about two pounds of methamphetamine that he had been manufacturing in a motel room and had a pistol in his pocket when arrested. These charges were still pending when he was arrested for the murder. On June 23, 1987, when he was arrested for the murder, Atherton also was charged with auto theft and possession of dangerous drugs. He stated that the auto theft charge later was dismissed. According to Atherton, the several drug charges that were pending when he was

9

arrested for the murder went by the wayside because the "murder took precedence over everything." RT 14. However, the charge for possession of dangerous drugs filed with the murder charge did result in a guilty plea and conviction. Resp. Exh. 2 at 3. And, as noted earlier, he was convicted of assault with a deadly weapon for his activities with the first victim in the hotel room.

Atherton became a heroin addict in the 1970s. RT 14-15. He told the probation officer that in 1978 he was a heroin addict and had overdosed. Resp. Exh. 2 at 8. He stopped using heroin when his older brother overdosed and died from heroin in 1981. He started using methamphetamine 3-4 years later (i.e., in about 1984 or 1985). RT 15. About six months before the murder, he was using amphetamines and heroin. RT 16.

The district attorney, in his statement of opposition to parole, added more details about Atherton's drug-related lifestyle. According to the district attorney, a few days before the murder, Atherton's friend visited Atherton and his wife in the apartment in which they had the meth lab, used heroin with them and overdosed. RT 42-43. The next day, Atherton thought the friend was dead from the drugs. Rather than summon the authorities or seek medical care for the friend, Atherton decided to roll him up in a comforter and dump his body in Riverside. RT 44. When the police asked Atherton about it, he asked for immunity and then told the police that his brother came up with the idea to dump the body. RT 45-46. The brother denied that it was his idea. RT 46. The district attorney hypothesized that Atherton had dumped the body elsewhere because he did not want the police near his meth lab. RT 46. This activity never resulted in any criminal charges apparently.

The BPH stated in its decision that Atherton was "kind of a one-man crime spree here for a while. And it boiled down to, not making any excuses for you, but it boiled down to the narcotics, both using it as a livelihood and doing them has a tendency to skew your good judgment." RT 61. The BPH also noted that Atherton's criminal conduct may not have been escalating in violence but was escalating in general during the several months before Atherton committed the murder. RT 62.

        c.      <u>Need For More Self-Help</u>

The BPH also relied on the fact that Atherton needed further self-help programming. RT 62. The BPH was particularly concerned that Atherton had been told at the last Board hearing that he needed to get some more self-help done, yet he had not bothered to start it until four months before this hearing date. RT 62. Atherton stated that he had returned to AA or NA four months before the present hearing but did not have the certificate of participation. RT 31. It turned out that he had more than a two and a half year break from AA or NA, as he had stopped it three years before the hearing and restarted it four months before the hearing. RT 32. When asked why he waited so long to resume the self-help programming after having been told in January 2004 to do it, Atherton responded, "I took a short break." RT 33. One of the commissioners pointedly told him, "it's the wrong time to take a break, sir, you know." RT 62. Another commissioner noted that, if the 2005 hearing had occurred on the planned schedule several months earlier, Atherton would not have had *any* time in the AA or NA program since the last hearing at which he was told to return to the self-help programming. RT 67. The BPH found that Atherton needed further self-help programming.

       2.      <u>State Court Decision</u>

The Orange County Superior Court rejected Atherton's habeas petition in a reasoned decision. Resp. Exh. 4. In that court, Atherton had made the familiar arguments that there was no reliable evidence to support the BPH's decision and that the BPH could not continue to rely on only the commitment offense alone because it was an unchanging factor. <u>Id.</u> at 2. The superior court explained that under the then-controlling state court case of <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1071 (Cal. 2005), the BPH could protect public safety by considering the dangerous implications of the commitment offense and had to point to factors beyond the minimum elements of the crime, it did not need to do further comparative analysis before concluding that the facts of the offense made it unsafe at that time to fix a date for the prisoner's release.

> Here, the BPT noted the "terrifying and terrorizing" of the first victim, the dispassionate shooting of the murder victim, Petitioner's life of crime at the time

11

> including his bail status and Petitioner's apparent drug trafficking. Thus it pointed to factors "beyond the minimum elements of the crime." (Citation.) The BPT could have denied parole on that basis alone. It did not, however, do so. The BPT also mentioned that at the hearing 17 months before it had specifically told Petitioner to participate in more self-help and Petitioner was very tardy in complying with that direction. Thus no understanding had been gained; rather, a big question mark remained.

Resp. Exh. 4 at 3.

       3.       <u>Analysis Of Federal Claim</u>

This court applies § 2254(d) to the Orange County Superior Court's decision because it is the last reasoned decision from a state court on Atherton's claim. See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005). The superior court did not unreasonably apply <u>Superintendent v. Hill</u> in rejecting Atherton's petition, even though that court never mentioned the some evidence standard or <u>Superintendent v. Hill</u> in its decision. See <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (per curiam) (state court need not cite Supreme Court precedent to pass muster under § 2254(d)).

Notwithstanding the positive factors for Atherton, the BPH had determined that, 18 years into his 17-to-life sentence, Atherton posed an unreasonable risk of danger to society if released from prison because of the murder plus his criminal lifestyle leading up to the murder and his need for further self-help programming that he had delayed getting. There is a rational connection between the evidence relied on and the decision that he is a current threat. Atherton's acts on the date of the murder were unusually callous, as he went to the hotel room and shoved a gun in one man's face, fired a shot near him, and threatened him before departing in search of his ultimate victim, who he shot in the head. The record indicates that this was not a spontaneous shooting: Atherton went with a loaded weapon in search of the murder victim. Not only were his acts not spontaneous within that day, for months he had been manufacturing methamphetamine and for years he had been abusing drugs. The extensive involvement with drug use and drug manufacturing leading up to the murder made this prisoner one for whom the parole board could reasonably have great concerns about his current dangerousness. His history also provided reasonable cause for concern about his apparent waning interest in self-help programming, a waning interest that

1  was demonstrated by him stopping about three years before the parole hearing and waited
2  many months to return to it after a previous parol board recommended he do so.  His excuse
3  that he had not returned to a self-help program because he wanted to take a break did not sit
4  well with the BPH commissioners.  Their dismay was understanable in light of their view
5  that Atherton's activities on the day of the murder were "so seriously antisocial."  RT 65.

6  Atherton argues here that he only took a break from self-help programming because of
7  a conflict with his work assignment.  Traverse, p. 2.  However, he did not present this reason
8  to the BPH and the reason he did present to the BPH suggested that a lack of interest was the
9  reason for stopping the program.  Where, as here, the legal question is whether there was
10 sufficient evidence to support a decision, the petitioner cannot ask the reviewing court to
11 decide his case based on evidence that is new and different from that which he  presented to
12 the decisionmaker whose decision is being reviewed.

13 Atherton correctly points out that his criminal history is not of the violent sort
14 mentioned under the regulation's list of factors showing unsuitability, 15 Cal. Code Regs. §
15 2402(c)(2), but overlooks the fact that subsection (b) of the same regulation allows the panel
16 to consider all relevant and reliable information available to it.  Atherton's drug-related
17 criminal history is a substantial part of the picture and the BPH reasonably could consider it
18 in its parole suitability decision.   Ignoring the drug-related criminal history would lead to an
19 inaccurate picture.

20 Bearing in mind that the court's chore is to consider not whether some evidence
21 supports the reasons, but whether some evidence supports the conclusion that Atherton's
22 release unreasonably endangers public safety, this court concludes that the Orange County
23 Superior Court's rejection of his insufficient evidence claim was not contrary to or an
24 unreasonable application of the Superintendent v. Hill some evidence standard.  Atherton is
25 not entitled to the writ.
26 / / /
27 / / /
28

**CONCLUSION**

For the foregoing reasons, the petition is denied on the merits. The motion to lift a stay is dismissed because this action was never stayed. (Docket # 9.) The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 30, 2010

Marilyn Hall Patel
United States District Judge

# NOTES

1.      The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

2.      The California Supreme Court's determination in Lawrence, 44 Cal. 4th 1181, that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).  However, Lawrence does not govern this court's analysis in every respect.  This court is not bound by the discussion in Lawrence (see footnote 4, infra) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous.  As to that point, Lawrence is persuasive authority, while the Ninth Circuit's holdings in Sass, Biggs, and Irons are binding authority.  Also, Lawrence's determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

3.      En banc review is now pending in a fourth case regarding the some evidence standard, Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008).  The order granting en banc review states that the panel opinion is of no precedential value.

4.      The California Supreme Court discussed the use of the commitment crime to deny parole in the companion cases of Lawrence, 44 Cal. 4th 1181, and In re Shaputis, 44 Cal. 4th 1241 (Cal. 2008).  The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety."  Lawrence, 44 Cal. 4th at 1191 (emphasis in source).  Applying that rule, the court determined that there was not some evidence to deny parole in Lawrence but that there was some evidence to deny parole in Shaputis.